9595

WHEELER *ET AL.* v. CORLEY *ET AL.*

(91 S. E. 307.)

1. NOTICE—QUESTION OF FACT.—Notice is always largely a question of fact, dependent upon all the circumstances of the particular case.
2. MARSHALING ASSETS AND SECURITIES—CONSTRUCTIVE NOTICE—"NOTICE." —"Notice" that land owned by another was also liable on a first mortgage debt, etc., *held* sufficient to put subsequent mortgagees on inquiry amounting to notice that the other person was a mere surety, so that they were not *bona fide* creditors without notice, entitled to have the first mortgage satisfied from the sale of the other land under the two fund doctrine.

Before MOORE, J., Saluda, May, 1916.     Affirmed.

Suit by George C. Wheeler and others against E. M. Corley and others.   From a decree, defendants, Batesburg Cotton Oil Company and another, appeal.

*Messrs. Thurmond & Timmerman* and *Hendersons,* for appellants.   The latter cite: *As to constructive notice of liability of mortgagors:* 27 Cyc. 1044; 1 Hilliard Mortgages 275.   *Subsequent purchaser:* 28 S. C. 516; 45 S. C. 18; 18 S. C. 138; 27 Cyc. 1183; 6 N. Y. Sup. Ct. 462.   *Notice:* 67 S. C. 388; 34 S. C. 339; 14 S. C. 142; 20 S. C. 142; 34 S. C. 568; 8 S. C. 302; 2 Pom. Eq. Juris. 605; 23 A. & E. Enc. of L. 508; 23 Cyc. 514.   *Estoppel:* 67 S. C. 386; 95 S. C. 338; 100 S. C. 64.   *Two fund doctrine:* 18 S. C. 432.

*Mr. W. E. Able,* for plaintiff-respondent.

*Mr. R. H. Etheredge,* for defendant, Trotter, respondent.

*Messrs. W. E. Able* and *B. W. Crouch,* for defendants, Long and Corley.

February 9, 1917.

The opinion of the Court was delivered by MR. JUSTICE GAGE.

The questions made by the appeal raised betwixt the defendants, Jones Company, and the Batesburg Cotton Oil Company, on the one side, and the defendants, Corley and Long, on the other side.   On these questions the Circuit Court went with Corley and Long, and the oil company has appealed.

The questions arise out of these facts: One Trotter sold Corley 208 acres of land on a credit for $3,000; and to evidence the debt Corley made Trotter a note payable in eight equal yearly installments, and Long signed this note with

Corley; and, to secure the payment of the note, Corley gave Trotter a mortgage on the same land, and Long gave Trotter (in the same instrument) a mortgage on Long's 150 acres of land. In this mortgage it was recited that Corley had the same day bought the land from Trotter; that Long's land was the same on which he resided; that Corley was the fee simple owner of the first tract and Long was like owner of the second tract. Corley had married Long's daughter. Five years thereafter, Corley became indebted to Jones Company in the sum of $4,500 for a lot of goods and merchandise that Jones Company had sold him, and to secure that debt Corley gave to the Jones Company a mortgage on the 208 acres of land. That mortgage is now held by the oil mill. In that mortgage it was recited that the land is the same bought from Trotter about four years before, and that the only incumbrance on it is a mortgage of $1,875 and interest, balance on the purchase price of the land The deed from Trotter to Corley is not fully printed in the case; but it does appear that the instrument stated the purchase price of the land to be $3,000.

The oil company contends that Trotter has two funds out of which to pay himself this balance of the purchase price due to him, to wit, the 208 acres he sold Corley and the 150 acres Long gave him a mortgage on; that the oil company has only one fund to pay itself for the goods sold Corley, to wit, a second mortgage on the 208 acres of land of Corley; that the oil company had no notice of the relationship of Long to the transaction; and the oil company asks that Trotter shall be required to go first on Long's 150 acres, before he resorts to Corley's 208 acres.

The Circuit Court seemed to apply the two fund doctrine to the facts; at least, such application was not denied by the Court, so that no question is now made to sustain or to overthrow that view. We pass no judgment, therefore, upon that question.

Proceeding further, however, the Court found, as a matter of fact and law, that the circumstances of the case carried to Jones notice of the relationship of Long to the transaction betwixt him and Corley, to wit, that Long was only a surety upon Corley's obligation to Trotter. The sole question made by the appeal is from that conclusion, and, while there are eight exceptions, there is only one issue.

So the issue we now take up is: Did the Joneses have notice of the relationship of Corley and Long towards the Trotter debt? That is always largely a question of fact, dependent upon all the circumstances, and one case does not much help the decision of another case. "Notice" is generally a subtle thing, evidenced as often by what was not done as what was done. · It sometimes crops out in testimony given to prove it did not exist. It is elusive, and rests in silence as well as in speech. Like a thief in the night, it sometimes goes equipped with weapons of offense, and when detected uses those weapons in alleged self-defense.

In the instant case, there were three Jones brothers in interest and to testify, one of them five times; they are all the sons of an old merchant named E. Jones. The Joneses, including the father, had lived and done business at Batesburg for 30 years. The three sons, C. E., A. S., and A. C. Jones, owned the store in the instant case; and they also owned the oil mill; and one of them, A. C. Jones, is cashier of a Batesburg bank; and one of them, C. E. Jones, is secretary and treasurer of the oil mill, and one of them, A. S. Jones, had charge of the store. Corley and Long live in the distant vicinity of Batesburg at Denny's Cross Roads, some 18 miles away, and Corley was postmaster there, and the testimony shows that Corley was often at Batesburg. The likelihood, then, is that the three Joneses had a fairly good notion of credits and relationships in the trading country round about Batesburg; though C. E. Jones alone testified he had no knowledge of Corley's affairs until .

the transaction in issue   There is no question but that Corley bought the 208 acres from Trotter; that the purchase price was $3,000, or about $15 per acre; that none of it was paid down; and that Corley made to Trotter his note for the whole purchase price for $3,000, payable in eight yearly installments; that Long signed the note with Corley; and that to secure the payment of the note a mortgage was made to Trotter on the same 208 acres and on 150 acres owned by Long and upon which he lived; that Long's relationship to the transaction was only that of guarantor.   The only question is: Did the Joneses have notice of these things actually or constructively when they sold out their stock of goods to Corley on May 17, 1910, for $4,500 on a credit and for security took a mortgage thereon and on the 208 acres of land?

Corley distinctly testified that when he made the mortgage to the Joneses he told them of Long's true relationship to the transaction.   That was actual notice; and, if it be true, then the Joneses were not *bona fide* creditors without notice. The Jones brothers all denied any such revelation by Corley, and their testimony is generally a denial, though some of it went further than that.   The sale of the goods was made by A. S. Jones.   The papers, including the mortgage, were drawn under the direction of A. C. Jones and in his bank. C. E. Jones was not at Batesburg the day the papers were made, but he carried them to Saluda for record, and at that time had counsel to examine the record as to Corley's title. The goods had not then been delivered to Corley.

About the sale of the goods and the execution of the real estate mortgage, A. S. Jones testified: Corley offered as security a mortgage on 208 acres which he owned, and upon which he owed some $1,800.   Corley told him that there was more land to go with this 208 acres; that he also said that there was another piece of land in the $1,800 mortgage which was for the same debt; and that if it came to a showdown the other tract could take care of the $1,800; and that

the witness supposed the records were looked up. He did not testify that Corley told him who it was that owned the other land, nor what its acreage was, nor what it was worth, nor who held the $1,800 mortgage, nor what that debt was for.

A. C. Jones testified: That Corley told him, when the mortgage was made, that he owned a place worth $5,000 he could give papers on; that one paper was on it for about $1,800; that there was another place up to secure the same debt; that if necessary the other place could be sold first; that he was not sure Corley said who the other place belonged to, though he said it belonged to another gentleman; but he did not say who the other man was; that if it became necessary the other man's place could be sold first; that Corley did not tell him the $1,800 mortgage was for purchase money; that he denied any knowledge of the relationship of principal and surety between Corley and Long. Like A. S. Jones, he did not testify that Corley told him who owned the other tract, nor about the area of it, nor about the value of it, nor who held the $1,800 mortgage, nor what that mortgage was given for.

C. E. Jones testified: That after the mortgage was made, and before the stock of goods were delivered, Corley told him that he owed about $1,800 on the 208 acres; that another place was in the mortgage with the 208 acres, and the witness had already consulted counsel about the effect of that situation; that the witness had no notice, prior to the sale of goods and making of the mortgage, of the fact that Long was only a surety for Corley. Like his brothers, he did not testify to the important matters above recited, and about which they failed to testify.

This testimony sounds much like the three Joneses and Corley, too, were all well acquainted at the outstart with the two fund doctrine, and the equitable remedies of marshaling and subrogation. If the Joneses understood that the 208-acre tract was, in effect, to be held liable for the debt due to

them, and that the land of the "other gentleman" was to be liable for the $1,800 due to Trotter, it is a potent circumstance that they did not know who owned the other land, how many acres were in it, and what it was worth. If the Joneses knew that the $1,800 debt was the debt of Corley, and they say so, then they ought to have asked themselves how "another gentleman's" land came to be mortgaged to pay that debt? When the Joneses knew that two parcels of land were up to pay the $1,800 debt, and that such debt was due by Corley, they ought in prudence to have made some inquiry about the relationship of the "other gentleman" to the $1,800 debt. So far as the testimony shows, they did not ask Corley a word about it, although by their testimony Corley opened the door for such inquiry.

We come now to the notice which the Joneses got by construction, from the deed by Trotter to Corley, from the mortgage by Corley and Long to Trotter, from the mortgage by Corley to Jones, from the records in the clerk's office at Saluda, and from the advice of counsel to Jones. All these circumstances were before the Joneses before the goods were delivered by them to Corley; they examined the records at Saluda with counsel; they saw them all, and were there advised by counsel. The deed from Trotter to Corley, and the mortgage back from Corley to Trotter, show that the whole of price was on a credit, and the mortgage was given for the purchase price. The recitation in the mortgage from Corley to Jones, before referred to, was a pointer to the Joneses to inquire how Long came to mortgage his home place to Trotter to secure the payment to Trotter of the purchase price of the 208 acres due by Corley. But the Joneses now say they consulted counsel before they let go the stock of goods. If they did, it is not in evidence what counsel told them. The implication is counsel told them that, if Trotter had two funds to pay the debt due to him, and they had only one fund to pay the debt due to them, then Trotter must first exhaust the singly charged fund before he

went on the doubly charged fund. If that be so, and there is no other conclusion to draw from the testimony of C. E. Jones, then with this advice, and with the notice they got from Corley, and from the record, the Joneses ought to have ascertained exactly what Trotter's claim on the other tract was, and who the "other gentleman" was; they ought to have informed themselves of these facts necessary to be proven before an application of the two fund doctrine is made.

We have not cited any authority on the subject of actual and constructive notice. The cases, from our own reports, cited by appellant, are not conclusive of the question here involved.

The law of notice is so plain that we conclude that the Joneses had notice in this case, and that they are not *bona fide* creditors without notice.

The decree below is affirmed.